**David J. SCHNEIDER, Jr., Garry Holmberg, Larry Holmberg, The Amusement Center, Inc., a Minnesota corporation, Plaintiffs,**

v.

**The CITY OF RAMSEY, a municipal corporation, Defendant.**

**No. Civ. 4–90–320.**

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 17, 1992.

Randall D.B. Tigue, Minneapolis, Minn., for plaintiffs.

James J. Thomson, Robert Alan Alsop, Holmes & Graven, Minneapolis, Minn., William Kirk Goodrich, Randall Dehn & Goodrich, Anoka, Minn., for defendant.

Brian Boru O'Neill, Michael A Ponto, Faegre & Benson, Minneapolis, Minn., for amicus.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

DIANA E. MURPHY, District Judge.

Plaintiffs brought this action alleging that defendant's zoning ordinances violated their rights under the first and fourteenth amendments of the United States Constitution. They seek injunctive relief and damages under 42 U.S.C. § 1983.

This case raises important issues relating to constitutionally protected rights of freedom of expression and access by the public, and conflicts that arise when local land use planning measures attempt to restrict them. These issues are of particular concern to the courts, which must be vigilant to protect civil liberties, especially when the content of expression may be controversial or unpopular with local political majorities.

Initially, plaintiffs challenged ordinance no. 90–7, a moratorium ordinance adopted by the City of Ramsey (the City) on April 23, 1990 banning adult uses, with misdemeanor criminal penalties. On May 11, 1990, the court issued a temporary restraining order prohibiting the City from enforcing this ordinance pending a hearing on plaintiffs' motion for a preliminary injunction. On May 22, 1990, the City passed ordinance no. 90–9, amending ordinance no. 90–7 to limit the location of adult uses and to impose only civil penalties. The court dissolved the temporary restraining order on June 19, 1990 and dismissed plaintiffs' motion for a preliminary injunction concerning ordinance no. 90–7 as moot. Subsequently, the City adopted ordinance no. 90–23, a permanent zoning ordinance covering adult uses, on November 13, 1990. This ordinance is now the subject of plaintiffs' request for injunctive relief.

Trial was held before the court over four and one-half days, with nine witnesses testifying and over 80 exhibits received. Following trial the parties submitted written arguments and proposed findings of fact and conclusions of law. A post-trial brief was also filed by the Minnesota Civil Liberties Union as *amicus curiae*.[1] The court now submits in memorandum form its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), based on its observation of the witnesses and their credibility, and upon review of the exhibits and deposition testimony.

### I.

Plaintiff Larry Holmberg is the owner of real property located at 6710 Highway 10 Northeast in the City of Ramsey, Minnesota. Plaintiff Amusement Center, Inc. is a Minnesota corporation whose sole officer and shareholder is Larry Holmberg. It currently operates an adults only business located on the real property owned by Larry Holmberg. Defendant City of Ramsey is a municipal corporation organized under the laws of the state of Minnesota. It has the authority to enact municipal ordinances regulating the licensing and zoning of businesses and to impose civil or criminal penalties to enforce such ordinances.

On or about April 19, 1990, plaintiff Garry Holmberg opened the adult business, including the sale of adults only books and magazines, the sale of sexual novelties, and coin-operated motion picture viewing ma-

---

**1.** Although the City initially opposed granting leave to the Minnesota Civil Liberties Union to participate as an *amicus curiae*, the City indi- cates that it agrees with the principles of law contained in the *amicus* brief.

chines for viewing adults only motion pictures on the premises. Amusement Center, Inc. currently operates the business.

The business is located adjacent to Highway 10, a significant commercial thoroughfare in the City. The building is visible from the highway, with large signs indicating, "ADULT BOOKSTORE" and "XXX". There is no direct access to the business from Highway 10, only from a smaller sidestreet to the south of the highway. The business property is bordered on the west by a garage rental facility and a day care center; on the east by a welding supply and sales business. Across the smaller sidestreet to the south is a bowling alley with an on-sale liquor license. The business is also within 1000 feet of a church and residentially zoned property. The property along Highway 10 in the City has various uses, including vacant land, light industrial uses, some residences, small office buildings, used car and recreational vehicle sales establishments, and one convenience store.

Larry Holmberg had purchased the property on February 9, 1989 for $140,000. There was no active business on the site at the time. Although in the municipal services area, the building is not connected to the City's water or sewer services but has its own well and septic system. Initially, Larry Holmberg operated "Larry's Pizza" on the property, a pizza restaurant and delivery business, including some pool tables. In April 1990, he agreed to sell the property to David J. Schneider for $150,000, but Schneider subsequently abandoned this agreement leaving the property in the ownership of Larry Holmberg. His bank had appraised the property at a value of $168,000.

When the adult business opened, the city had no ordinance concerning the location of adult use businesses. There was no other adult business within the City at that time, nor is there currently.

The Ramsey City Council held a special meeting on April 23, 1990 to address concerns about the operation of the new adult business in light of the City's lack of any zoning relating to adult businesses. It adopted an interim ordinance imposing a 180–day moratorium on the operation of any adult business in the City. It included misdemeanor penalties of imprisonment up to 90 days and a fine up to $700 for each offense, with each day that a violation occurs considered a separate offense.

Late in the afternoon of April 24, 1990, Larry Holmberg was operating the business. A WCCO news reporter arrived at about 5:15 p.m. and informed Holmberg that he was there to film an arrest. Holmberg then closed the store and contacted an attorney to begin legal proceedings to prevent the City from enforcing the ordinance against the business. He did not contact any City official before closing the store, nor did any City official communicate any intent on the part of the city to arrest or prosecute him or to enforce the ordinance in any manner.

Following the temporary restraining order issued on May 11, 1990, and the requisite posting of a $10,000 bond, the business reopened on May 14, 1990. Records submitted by plaintiffs show that during its period of operations in April 1990, approximately five and one-half days, the store had gross receipts of $3,650. The cost of sales was $913, leaving a gross profit of $2737. The operating expenses for the period included $897 labor, $75 depreciation, $38 printing, and $18 repairs and maintenance, leaving a net profit of $1,710.

The business has been in continual operation since re-opening in May 1990. Following the adoption of the amended moratorium ordinance by the City, and the dissolution of the temporary restraining order by the court on June 19, 1990, the City commenced a declaratory judgment and injunction action in state court to determine whether the ordinance as amended applied to the business and whether the use of the property was allowed. Plaintiffs counterclaimed, challenging the constitutionality of the amended ordinance and claiming damages for the time period the business was closed. The state court action was ultimately settled.

On May 8, 1990, the City hired David Licht of Northwest Associated Consultants

to research the issue of adult use regulations. Licht is a professional planner. His organization specializes in advising municipalities on land use issues. In researching this issue, Licht relied upon studies of the secondary effects of adult businesses conducted by other cities, including Rochester, Minneapolis, and St. Paul, Minnesota; Indianapolis and Marion County, Indiana; Seattle and Renton, Washington; and Phoenix, Arizona. He reviewed other reports, including a report from the Minnesota Attorney General on the regulation of sexually oriented businesses, and reports from the National Coalition Against Pornography and the Dallas Association for Decency. In addition, Licht utilized information from the City obtained from the City police department and from public hearings. He was not able to document an actual decrease in property values in the City based on the short period of time the adult business had been open in the City. The police reports consisted largely of complaints from protestors at the business about the operation of the business and the conduct of its workers, and complaints from Larry Holmberg about the conduct of the protestors. There is no evidence that any City official intended the Licht research process to result in a predetermined outcome.

Based on Licht's research and the public hearings, the City concluded adult uses create secondary effects in the community, including increased crime, increased health risks, diminished property values, and general neighborhood blight. It found that these effects are particularly experienced when the adult use is accessible to minors or located near residential property or related residential uses such as schools, day care centers, libraries, or parks. It found that special regulation of adult uses is necessary to ensure that the adverse secondary effects would not contribute to or enhance criminal activity in the area of such uses nor contribute to the blighting or downgrading of the surrounding property and lessening of its value.

In preparing his recommendation to the City, Licht assessed not only the adverse secondary effects, as shown in the reports from other municipalities, but also the gen-

eral zoning plan in the City. He concluded that the existing scheme was inadequate because the business zone, then called "B-1", was too broad, providing no transitional zone or capacity to distinguish industrial and commercial uses. He recommended that the City adopt two new kinds of zones, a "B-3" zone for the business district along Highway 10, and a "B-W" zone to focus certain uses off the main commercial corridor and provide a transition to industrial zones. He also concluded that the City was over-zoned for industrial uses and recommended that these be more concentrated. Licht recommended that adult uses be limited to the B-3 and B-W zones, and that adult uses be separated from residential zoned districts, schools, day care centers, libraries, parks, on-sale liquor establishments, and churches, as well as from other adult uses. He drew a map showing proposed boundaries for the new B-3 and B-W zones, and showing the effect of separation distances of 500, 750, 1000, and 1320 feet. Licht recommended a distance of 750 feet.

Licht's recommendations were reviewed by the City attorney, City administrator, City Economic Development Commission, City Planning Commission, and the City Council. The Planning Commission modified Licht's recommendation to a separation distance of 1000 feet, and this distance was presented to the City Council.

On November 13, 1990, the City Council enacted ordinance no. 90–23, permanently amending the City Code relating to zoning. The council adopted Licht's recommendation to create new B-3 and B-W zoning districts, but redrew the boundaries of the B-W area to include more land north of Highway 10 in the central part of the commercial area and less land along Highway 10 to the southeast. This resulted in more total land in the B-W zone, but less along Highway 10. Licht testified that this change was reasonable in light of the goals for the B-W district and fit with his zoning philosophy. The council also accepted the recommendation of the Planning Commission that the separation distance be 1000 feet, instead of the 750 feet recommended by Licht. Licht testified that he had rec-

ommended 750 feet in order to provide what he considered a sufficient adult use opportunity area based on his understanding of Supreme Court decisions; but that once the City Council expanded the B–W zone to include more land, the 1000 foot separation then appeared acceptable.

Ordinance no. 90–23 provided that adult uses in existence at the time of its adoption had until December 31, 1991 to comply with its provisions. This was later extended to January 31, 1992, and an adult business was allowed to request an extension beyond the deadline if it could show that the amortization period was an unreasonable burden which did not allow adequate time to recover a reasonable investment return. Non-adult uses which became non-conforming under ordinance no. 90–23 were permitted to continue indefinitely, unless there was a documented study demonstrating that such non-conforming uses posed a danger and/or threat to the health, safety, and general welfare of the community, in which case an amortization period of up to five years was permitted. Licht testified that since the documented study had already been conducted concerning adult uses, the procedure for amortization differed from non-adult non-conforming uses. The findings were already made by the City Council concerning the secondary effects of adult uses; these findings were presumed in the new amortization procedures.

The new ordinance also limited adult businesses to no more than one adult use per location. Plaintiffs' business included three different adult uses under the terms of the ordinance: adult books and magazines, adult novelties, and adult motion picture arcade. The City subsequently exempted plaintiffs' business from this one use limit, so it is not relevant here.

Plaintiffs' business is adult use within the meaning of ordinance no. 90–23. It is located within 1000 feet of residentially zoned property, a licensed day care center, a church, and an on-sale liquor establishment. Plaintiffs failed to request an exten-sion of the January 31, 1992 deadline. The continued operation of the business constitutes a violation of the ordinance. Nevertheless, the City has taken no actions to date to enforce the ordinance against the business. Although the City Council has discussed and adopted revisions to the ordinance since its original adoption, on which occasions Larry Holmberg argued for the ordinance's repeal, it has not made any modifications other than those already indicated.

Subsequent to the adoption of the ordinance, there has been no evidence of decreased property values in the vicinity of the adult business.[2] The City adopted a new health ordinance in 1991, ordinance no. 91–14. Following a hearing, an administrative law judge determined that high risk sexual conduct has occurred at the business, and that the business was a hazardous site, as defined by the ordinance, creating health risks. The City has sought an injunction against the business in state court, seeking an order to comply with the health ordinance. The evidence shows actual adverse secondary effects since the adoption of ordinance no. 90–23.

At trial, various real estate and planning experts testified concerning the relocation opportunities available to an adult business in the City under the terms of the permanent ordinance. The City is an outer-tier suburb northwest of Minneapolis with a population of about 14,000. It was formerly a township and still includes large agricultural sections in addition to residential subdivisions. It contains approximately 18,500 total acres. Of these, 4,800 are located in the general urban area, and 13,-700 in the rural area. About 88% of the City is zoned for residential uses. The other portion of the City is zoned for commercial or industrial uses, largely near Highway 10. Under the ordinance, 466 acres are available for adult uses. This is about 35% of the land zoned for commercial

2. Following Licht's report, a group of property owners in the vicinity of the adult business petitioned the City Board of Review to lower their property taxes by 25 percent, which the Board did. Following an investigation by Ed Thurston, Senior Appraiser in the Anoka County Assessor's Office, the Anoka County Board of Adjustment reversed this decision.

purposes, 9.7% of the general urban area, and 2.5% of the total land.

The adult use opportunity area consists of land adjacent to the north of the Highway 10 commercial corridor. This land is mostly vacant, but development sites are available within sight of Highway 10 and along two major thoroughfares which intersect Highway 10, namely Armstrong Boulevard on the west and Sunfish Lake Boulevard on the east. There is also land available along Ramsey Boulevard, in the middle of the opportunity area. One lot available for development is adjacent to a small supermarket; the City approved an off-sale liquor establishment at that site but the owner has not proceeded with development. Some of the land might require subdivision in order to be a suitable site; one such parcel is located on Sunfish Lake Boulevard just north of a new car dealership. To purchase a one-acre lot and build a 2,400 square foot structure, the size of the current adult business, including construction of a private well and septic system, site improvements, and building permits, would cost approximately $123,600. To purchase a five-acre lot, subdivide one acre into a building site, and build a comparable structure, including the above costs plus subdivision costs (surveying, etc.), would cost approximately $170,000 and the remaining four acres could be resold for about $48,000.

There are no legal or physical limitations that restrict general development in the opportunity area. Plaintiffs contend that the City would block any attempt to subdivide available land to establish an adult business. This is mere speculation, and the court declines to render an advisory opinion in the absence of any record of an attempt by plaintiffs to undertake such a subdivision. The process of subdividing, as such, does not make the available land legally unsuitable for adult businesses. Plaintiffs also contend that the land is unsuitable physically, but they base this contention on the absence of buildings available to lease in which to operate an adult business. The land itself is suitable for commercial development, however; in such a semi-rural, outlying area as Ramsey it is not surprising that new or relocating businesses would be required to develop vacant land. The evidence shows that purchase and construction of a new one acre or five acre site would cost less than the fair market value of Larry Holmberg's current property.

## II.

The first amendment of the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech." This liberty is extended to include protection against infringing state action by application of the fourteenth amendment. Operation of plaintiffs' adult business is covered by this protection, to the extent the City's actions are unconstitutionally infringing.

On its face, City ordinance no. 90–23 is a content neutral time, place, and manner regulation of protected speech. Its stated purpose is to regulate the adverse secondary effects of adult uses, and it accomplishes this goal by zoning limitations without a total ban. If, however, the ordinance was enacted "for the purpose of restraining speech on the basis of its content" it would be presumptively unconstitutional. *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46–47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986).

There is no indication that the stated purpose of the ordinance was a pretext masking a true purpose to restrain plaintiffs' speech on the basis of its content. The original ordinance, no. 90–7, was a temporary moratorium, not a permanent ban. Even before enforcement of this ordinance was temporarily enjoined, the City retained Licht to research the secondary effects of adult uses. Licht conducted a thorough study, properly relying on studies conducted by other municipalities. *See Renton,* 475 U.S. at 51, 106 S.Ct. at 931. He was not told what the outcome of his study should be. The study supports the action taken by the City in adopting ordinance no. 90–23. The distinction between adult non-conforming uses and non-adult non-conforming uses in the amortization provisions was based on Licht's completed

study. Plaintiffs suggest that the presence of Jehovah's Witnesses could also lead to adverse secondary effects due to community hostility, there was a non-conforming Jehovah's Witness building located in the City, and if the City had had in hand a documented study from another municipality showing adverse secondary effects of such an institution, it would not have amortized the local institution out of existence. They argue that this scenario shows that the City must have intended to limit the content of plaintiffs' speech. This scenario is merely hypothetical, however, and such speculation flies in the face of the evidence presented concerning Licht's actual study. There is no direct evidence that the City intended to limit the content of plaintiffs' speech, nor is there indirect evidence from which any such intent may be inferred.[3]

■■■ Content-neutral time, place, and manner regulations are acceptable "so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Renton*, 475 U.S. at 47, 106 S.Ct. at 928; *see also Alexander v. Minneapolis*, 928 F.2d 278, 282084 (8th Cir.1991). The substantial governmental interest in this case is the City's interest in limiting adverse secondary effects of adult uses. This interest was established through the City's reliance on the research conducted by Licht relying on the studies of adverse secondary effects in other municipalities. The City

> was entitled to rely on the experiences of Seattle and other cities ... in enacting its adult [use] zoning ordinance. The

First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.

*Renton*, 475 U.S. at 51–52, 106 S.Ct. at 931. Plaintiffs emphasize Licht's failure to include certain studies relating to the effects of sexually explicit material on individual consumers of such material. This failure is irrelevant here, where the study focused on the effects of adult businesses on the surrounding community, not individual consumers or patrons of the business. There is no indication that Licht's study was anything but a thorough, professional inquiry into evidence reasonably believed to be relevant to the problem the City was addressing. The findings adopted by the City incorporate conclusions from this study and express a substantial governmental interest.[4]

There is no constitutional defect in the method chosen by the City to further its substantial interests. The separation distance requirements are virtually identical to the ordinance approved by the Court in *Renton*. The requirements are "narrowly tailored" to protect the City's substantial interests. *Id.* at 52, 106 S.Ct. at 931.

■■■ Furthermore, the zoning ordinance provides for reasonable alternative avenues of communication. The ordinance leaves 466 acres available for adult uses. This is about 35% of the land zoned for commercial purposes and 9.7% of the gen-

---

**3.** Plaintiffs also argue that the inclusion of adult uses-accessory in the amortization clause shows the pretextual nature of the ordinance. The definition of adult uses-accessory in the ordinance covers businesses with a smaller percentage of adult use business that plaintiffs have. Plaintiffs' business falls under the definition of adult uses-principal. As they acknowledge, plaintiffs do not have standing to challenge the adult uses-accessory provision of the ordinance. *See Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 60, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310 (1976). Moreover, this provision is irrelevant here since it does not apply to plaintiffs' business and therefore could not show any intent to control the content of their business.

**4.** Plaintiffs argue that the lack of post-enactment adverse secondary effects in the City undermines reasonable reliance on Licht's study. This argument was rejected in *International Eateries of Am., Inc. v. Broward County*, 941 F.2d 1157, 1163 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1294, 117 L.Ed.2d 517 (1992): "Broward County appropriately tailored its distance ordinances to further its substantial government interest. If the decision was valid ex ante, International Eateries cannot justify violating the ordinances by showing that they were unwise ex post."

eral urban area. Because the great majority of the City is rural and suburban residential, under the City's particular circumstances these percentages are the appropriate measure in considering land available for adult use businesses. Much of the available land fronts on major thoroughfares. It is largely undeveloped, vacant land, but that is typical for most of the City's commercially available land. There is little, if any, land available for adult uses along Highway 10, but plaintiffs do not have a constitutional right to be located along Highway 10. There was some testimony that the available land was not commercially viable for an adult business. The cost of developing available land is comparable to or below the amount of plaintiffs' investment in the current property, however. The first amendment does not "compel[ ] the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices." *Id.* at 54, 106 S.Ct. at 932. The land available for adult uses in the City places plaintiffs in a similar position as many other businesses considering locating in the City. The land includes sites adjacent to current businesses. That plaintiffs "must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation." *Id.* The Ramsey zoning ordinance does not effectively deny adult entertainment businesses a reasonable opportunity to operate within the City.

The court concludes that Ramsey ordinance no. 90–23 is not unconstitutional under the first amendment.

■ Plaintiffs allege that ordinance no. 90–23 violates the equal protection clause of the fourteenth amendment to the United States Constitution because of the difference between amortization provisions covering adult and non-adult non-conforming uses. The court has already found that this difference was not based on any intent to discriminate against the content of plaintiffs' speech. Absent such evidence of purposeful discrimination, the ordinance may

pass muster if the City has a rational basis for treating adult uses differently. *Cornerstone Bible Church v. Hastings*, 948 F.2d 464, 472 & n. 13 (8th Cir.1991). The difference in amortization provisions is explained by the fact that Licht had already completed a study of non-conforming non-adult uses. Thus it made sense for the City to provide a date certain for amortization of the adult business, and to require a documented study before amortizing a non-adult business. The ordinance does not violate the equal protection clause of the fourteenth amendment.

Plaintiffs also allege that they are entitled to damages for losses incurred as a result of the enactment of City ordinance no. 90–7 on April 23, 1990. They argue that this ordinance was unconstitutional, and that the business was forced to close to avoid incurring its criminal penalties. The business was closed from April 24 at 5:15 p.m. until the morning of May 14, 1990. They claim lost revenues from this period as damages, in the amount of $13,272.80.

■ Ramsey ordinance no. 90–7 violated the first amendment because it left open no alternative avenues of communication. The evidence does not show that it was adopted with intent to suppress plaintiffs' speech; it was an emergency response intended to impose a moratorium on adult uses until the City could research and implement an appropriate permanent zoning ordinance covering such uses. Although content-neutral in this sense, it was constitutionally defective in that it left no location in the City where plaintiffs could operate their adult business. *See Renton*, 475 U.S. at 50, 106 S.Ct. at 930; *Young v. American Mini Theatres, Inc.*, 427 U.S. at 78–79, 96 S.Ct. at 2456 (Powell, J., concurring); *Schad v. Mt. Ephraim*, 452 U.S. 61, 75–76, 101 S.Ct. 2176, 2186, 68 L.Ed.2d 671 (1981).

■ Under *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the City may be held liable under 42 U.S.C. § 1983 for damages proximately caused by its unconstitutional ordinance. The City contends that the business was voluntarily

closed, so that the ordinance was not the proximate cause of any damages. It argues that the only evidence on causation was the hearsay statement by a news reporter to Larry Holmberg that he was there to film an impending arrest under the ordinance. While that particular statement may have been hearsay, the City ignores the simple fact that however Holmberg may have learned of the ordinance, a matter of public record, it would have been reasonable for him to close the business rather than face possible prosecution. In retrospect, it may have been preferable if he had contacted City officials upon learning of the ordinance in order to ascertain their intended course of action. His decision to close was not voluntary, however, but reasonable in the face of potential penalties for each day he remained open. Actions by the City subsequent to the reopening of the business are irrelevant to whether the ordinance caused it to close. Under all the circumstances, the ordinance proximately caused plaintiffs to suffer damages.

██ "Once the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount." *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn. 1977); *see also Unique Systems, Inc. v. Zotos Int'l, Inc.*, 622 F.2d 373, 378–79 (8th Cir.1980). The accounting records submitted by plaintiffs provide a reasonable basis upon which to approximate the amount of damages here. Plaintiffs are entitled to recover the gross profits they would have made during the period of closure, less operating expenses saved due to closure. An average of their gross profits less saved operating expenses during the five and one-half days the business was open prior to closure provides a reasonable basis for estimating the loss. Gross profits totalled $2737. Operating expenses saved in labor, printing, and repairs and maintenance totalled $953. The resulting figure, $1784, averaged over the five and one-half days, comes to $324. Since the business was closed for nineteen and one-half days, plaintiffs suffered a loss of $6,318. They are entitled to damages in this amount. Plaintiffs have presented no argument in support of their proposal that they receive interest on this amount.

In their proposed findings of fact and conclusions of law, plaintiffs propose that the court permit them to seek reasonable attorneys fees pursuant to 42 U.S.C. § 1988. By contrast, defendants propose that the court order that plaintiffs are not entitled to any attorneys fees as part of this action. Although the parties have not briefed the issue of attorneys fees, it would appear that plaintiffs are entitled to fees for their counsel's work in connection with ordinance no. 90–7. Plaintiffs should submit any fee request in accordance with Local Rule 54.3. At that time, the parties may also address the issue of awarding costs.

### ORDER FOR JUDGMENT

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Judgment be entered in favor of defendant on plaintiffs' claims that Ramsey ordinance no. 90–23 be declared unconstitutional and that its enforcement be enjoined.

2. Judgment be entered in favor of plaintiffs Larry Holmberg and Amusement Center, Inc., and against defendant City of Ramsey in the amount of $6,318 on the claim that Ramsey ordinance No. 90–7 was unconstitutional.

LET JUDGMENT BE ENTERED ACCORDINGLY.